UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
MADELEINE KRISTOFFERSSON, *on behalf of R.R.,*
*an infant, as her natural mother and guardian,*

**FILED**
**CLERK**

10:01 am, Sep 18, 2023

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

                                                                Plaintiff,

**MEMORANDUM & ORDER**
22-CV-01741 (JMA) (ARL)

                    -against-

PORT JEFFERSON UNION FREE SCHOOL DISTRICT,
ERIC HARUTHUNIAN, *High School Principal,*
JESSICA SCHMETTAN, *Superintendent,*
and MATTHEW SEFICK,

                                                                Defendants.
------------------------------------------------------------------------X

**AZRACK, United States District Judge:**

Plaintiff Madeleine Kristoffersson, mother of R.R., a student at Earl L. Vandermeulen High School in Port Jefferson, New York, alleges that Defendants violated R.R.'s First Amendment right to freedom of speech, as well as R.R.'s rights under the Fourteenth Amendment's Equal Protection Clause, when they refused to publish a poem submitted by R.R. to the high school's literary magazine. Plaintiff asserts constitutional and statutory claims on R.R.'s behalf under New York state law as well. She seeks compensatory and punitive damages, injunctive relief, and attorneys' fees and costs.

Currently before the Court are Defendants' motion to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim, (ECF No. 21), and Plaintiff's motion for partial summary judgment on her federal claims pursuant to Federal Rule of Civil Procedure 56(a). (ECF No. 36.) For the following reasons, Defendants' motion is GRANTED, Plaintiff's motion is DENIED, and the complaint is DISMISSED.

## I.    BACKGROUND

**A.    Facts**

In April 2021, R.R., then a tenth-grade student at Earl L. Vandermeulen High School, wrote

a poem titled, "Derek Chauvin's Ode To George Floyd: A Dark Sonnet."  (Compl. ¶¶ 4, 22, ECF

No. 1.)  The poem is reproduced in its entirety below.

> From Momma's hands, you had not any chance.
> The street, the 'hood made you so young ashamed
> To stand tall, to control your circumstance.
> "Black man, it's you we'll crack," white men proclaimed;
> "Stay down," they say, your fate is in our hands.
> Obey, ok, obey me, I'm the cop
> Who kneels upon your naked soul, who stands
> On top your darkened head until you stop
> Your sorry cry for mamma; take no breath,
> I bring justice here, pressed upon your neck.
> If I decide, you now face certain death,
> A fate deserved, 'cuz you passed a bad check.
> You can't breathe?  Then cease your black man drama,
> I will make you weep for "Mamma!  Mamma!"

(Id. ¶ 23.)  R.R. "intended the sonnet ironically, . . . to reflect the contemptuous racial hatred

demonstrated by a white figure of authority for a helpless African American," "to capture the

deeply bred racially motivated cause of the death of George Floyd," and "to convey the intense

reason for the nation-wide reaction to Chauvin's murder of George Floyd" on May 25, 2020.  (Id.

¶¶ 24–26.)

R.R. subsequently submitted the poem to The Mast, "a literary magazine published by

Defendants."  (Compl. ¶¶ 14, 27–28.)  As the "high school's literary magazine," The Mast was

published in print and online twice per school year and distributed to students, faculty, and

members of the Port Jefferson community.  (Id. ¶¶ 16–17.)  The Mast was edited "[a]t all times"

by high school students; Matthew Sefick, an English teacher at the high school and The Mast's

faculty advisor; and Eric Haruthunian, the high school's principal.  (Id. ¶ 18.)  Defendants and The

Mast's student editors solicited students to submit short stories, poems, and photos for publication.

(Id. ¶¶ 15, 19.)  Although The Mast's student editors "were charged with choosing amongst the

various submitted poems, short stories and photos," "[a]t all times, the choices . . . were subject to

2

approval or disapproval by [Sefick]." (Id. ¶ 21.)  Sefick's editorial decisions were in turn subject to review by Haruthunian, who "was charged with making a final decision as to whether any literary piece could be published in The Mast," with Haruthunian's final decisions "subject to approval" by Jessica Schmettan, the superintendent of the Port Jefferson Union Free School District.  (Id. ¶ 21.)

After R.R. submitted her poem to The Mast, "Defendants acknowledged that the sonnet was very well-written." (Compl. ¶ 27.)  Nevertheless, "Defendants . . . forbade the editors of The Mast to publish the sonnet," with Schmettan's authorization.  (Id. ¶¶ 28–29.)  R.R. "urged" and "protested" that the sonnet should be published in The Mast, but Defendants "refused to allow the sonnet to be published for the reason that it would allegedly create adverse emotional reactions and strife in the Port Jefferson community, amongst students and faculty, due to the sonnet's allegedly controversial content." (Id. ¶ 32.)

**B.    Procedural History**

Plaintiff commenced this action on March 29, 2022, claiming that Defendants' refusal to publish R.R.'s poem violated the First Amendment, the Fourteenth Amendment, and New York law.  After Defendants submitted a pre-motion conference letter regarding their proposed motion to dismiss, (ECF No. 9), to which Plaintiff responded, (ECF No. 12), the Court waived its pre-motion conference requirement and directed the parties to submit a briefing schedule.  (Electronic Order dated May 18, 2022.)

On August 31, 2022, while the parties were briefing Defendants' motion, Plaintiff filed her own pre-motion conference letter regarding a motion for partial summary judgment.  (ECF No. 20.)  The Court again waived the pre-motion conference requirement, (Electronic Order dated Sept. 2, 2022), and the parties subsequently briefed Plaintiff's motion.

3

## II.     MOTION TO DISMISS

The Court first addresses Defendants' motion to dismiss.  Defendants contend that Plaintiff's federal law claims should be dismissed for failure to state a claim, and that even if Plaintiff plausibly alleged a constitutional violation, the individual Defendants are entitled to qualified immunity. (Defs.' Mem. at 1–2, ECF No. 23.)  They also argue that Plaintiff's state law claims should be dismissed for failure to state a claim, and because Plaintiff did not comply with the notice of claim requirement under New York Education Law § 3813.  (Id.)  Plaintiff opposes Defendants' motion on all fronts.  (Pl.'s Opp'n, ECF No. 25.)

### A.     Legal Standard Under Rule 12(b)(6)

To survive a motion to dismiss brought under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556).  Although a court must accept all factual allegations in the complaint as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation."  Twombly, 550 U.S. at 555.  Ultimately, if the plaintiff's allegations "have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed."  Id. at 570.

In ruling on a Rule 12(b)(6) motion, "'a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint.'"  United States ex rel. Foreman v. AECOM, 19 F.4th 85, 106 (2d Cir. 2021) (quoting DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010)), cert. denied,

142 S. Ct. 2679 (2022). Additionally, even "'[w]here a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, thereby rendering the document integral to the complaint.'" Id. (quoting DiFolco, 622 F.3d at 111). When presented with matters outside the pleadings that are not properly considered on a Rule 12(b)(6) motion, a district court may "either elect to exclude [the] documents and rule on [the] motion to dismiss, or consider the documents and 'convert the motion to one for summary judgment and give the parties an opportunity to conduct appropriate discovery and submit the additional supporting material contemplated by Rule 56.'" Peterson v. Wells Fargo Bank, N.A., No. 22-1343-CV, 2023 WL 4363239, at *2 (2d Cir. July 6, 2023) (summary order) (quoting Chambers v. Time Warner, Inc., 282 F.3d 147, 154 (2d Cir. 2002)); see also Fed. R. Civ. P. 12(d).

In connection with her opposition to Defendants' motion, Plaintiff submitted a 25-page affidavit by R.R., (ECF No. 24), along with 21 exhibits, which include, among other documents, past issues of The Mast; emails among R.R., student editors, and Defendants regarding her poem; and 50-h examination transcripts. Defendants contend that the Court should not consider these materials in resolving their motion to dismiss. (Defs.' Reply at 1–2 & n.2, ECF No. 26.) The Court agrees.

Although this case "presents the atypical situation where [a] plaintiff[] submit[s] extrinsic documents in their opposition to [the defendant]'s motion to dismiss," the principles outlined above still apply. Madu, Edozie & Madu, P.C. v. SocketWorks Ltd. Nigeria, 265 F.R.D. 106, 122 (S.D.N.Y. 2010). Indeed, "[c]ourts in this Circuit have made clear that a plaintiff may not shore up a deficient complaint through extrinsic documents submitted in opposition to a defendant's motion to dismiss." Id. at 122–23 (collecting cases). As Judge Liman recently explained,

> [a] plaintiff who has eschewed attaching a document upon which it relies as an
> exhibit to the complaint, and who has not explicitly incorporated the document by
> reference and included the relevant allegations about the document in the
> complaint, is not ordinarily permitted—when it suddenly becomes expedient—to
> rely upon the document by attaching it to a declaration submitted in response to a
> motion to dismiss.

Wade Park Land Holdings, LLC v. Kalikow, No. 21-CV-1657, 2023 WL 2614243, at *10 (S.D.N.Y. Mar. 23, 2023) (citation omitted). None of the documents submitted by Plaintiff were attached to the complaint, and Plaintiff has made no attempt to demonstrate that the Court may properly consider them in ruling on Defendants' Rule 12(b)(6) motion. Aside from a bare recitation of the general principles outlined above, (see Pl.'s Opp'n at 8 n.1), she does not argue that they are incorporated by reference into the complaint, "integral" to the complaint, or subject to judicial notice. Therefore, the Court will exclude R.R.'s affidavit and the attached exhibits in ruling on the motion to dismiss. The Court declines to convert Defendants' motion to one for summary judgment.

**B.**   **First Amendment Claim**

The gravamen of Plaintiff's complaint is that Defendants violated R.R.'s First Amendment right to freedom of speech by refusing to publish her poem in The Mast.

It is well established that "students do not 'shed their constitutional rights to freedom of speech or expression,' even 'at the school house gate.'" Mahanoy Area Sch. Dist. v. B. L. by & through Levy, 141 S. Ct. 2038, 2044 (2021) (quoting Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 506 (1969)). At the same time, the Supreme Court "ha[s] also made clear that courts must apply the First Amendment 'in light of the special characteristics of the school environment.'" Id. (quoting Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 266 (1988)). Courts have created "various tests or 'standards for assessing whether a school's censorship of student speech is constitutionally permissible.'" Collins v. Putt, 979 F.3d 128, 132 (2d Cir. 2020)

6

(quoting Guiles ex rel. Guiles v. Marineau, 461 F.3d 320, 324 (2d Cir. 2006)).  The two standards relevant to this case, Hazelwood and Tinker, cover "two categories of student expression in the school environment, each of which merits a different degree of judicial scrutiny in connection with school-imposed speech restrictions." Peck ex rel. Peck v. Baldwinsville Cent. Sch. Dist., 426 F.3d 617, 627 (2d Cir. 2005).  Because Tinker is "more protective of student speech than Hazelwood," Collins, 979 F.3d at 132 (citing DeFabio v. E. Hampton Union Free Sch. Dist., 623 F.3d 71, 79 (2d Cir. 2010)), Plaintiff's First Amendment claim turns largely on which of these two standards is applied.

Defendants contend the Court should analyze Plaintiff's claim under Hazelwood.  (Defs.' Mem. at 9.)  Under Hazelwood's "deferential standard," Collins, 979 F.3d at 132, if The Mast constituted a "school-sponsored expressive activit[y]," then Defendants' refusal to publish R.R.'s poem was permissible "so long as their actions [were] reasonably related to legitimate pedagogical concerns." Hazelwood, 484 U.S. at 273.  Student speech is considered "school sponsored" under Hazelwood if "students, parents, and members of the public might reasonably perceive" the speech "to bear the imprimatur of the school." Id. at 271.

Plaintiff, on the other hand, insists that Tinker governs her First Amendment claim.  (Pl.'s Opp'n at 2.)  Tinker applies to "'a student's personal expression that happens to occur on the school premises,'" Collins, 979 F.3d at 133 (quoting Hazelwood, 484 U.S. at 271), i.e., speech that is not "school sponsored."  Under Tinker, "school officials may regulate student speech that the school does not sponsor if that speech would 'materially and substantially disrupt classwork and discipline in the school.'" Id. (quoting Guiles, 461 F.3d at 325).

Turning to the complaint, Plaintiff alleges that The Mast "is the high school's literary magazine . . . published by Defendants," which "carrie[s] short stories, photos, and poems written

7

by Defendants' high school students," and is "distributed to Port Jefferson students, faculty and community members." (Compl. ¶¶ 8, 14–17.) Plaintiff further alleges that "[a]t all times," The Mast "was edited by Port Jefferson students, the faculty advisor, and school principal, as selected by Defendants," who "solicited Port Jefferson students to submit poems, short stories and photos for publication," and who "were charged with choosing amongst the various submitted poems, short stories and photos[.]" (Id. ¶¶ 18–20.) Also, "[a]t all times," the student editors' decisions "were subject to approval or disapproval by the said faculty advisor, and the High School Principal was charged with making a final decision as to whether any literary piece could be published in The Mast," with "final" authority resting in the Superintendent. (Id. ¶ 21.) Taken together, Plaintiff's allegations establish that (i) The Mast is the literary magazine of Earl L. Vandermeulen High School; (ii) it is composed of works submitted by the school's students; (iii) the works are selected by student editors, whose decisions are subject to review by school officials, specifically, Sefick, Haruthunian, and Schmettan; (iv) it is published by the school; and (v) it is distributed to students, faculty, and members of the Port Jefferson community.

Based on the above allegations, the Court concludes that Hazelwood applies to Plaintiff's First Amendment claim because The Mast bears "hallmarks of school sponsorship." Collins, 979 F.3d at 133. Courts have relied on a combination of these very factors in concluding that student speech was school sponsored. For example, in R.O. ex rel. Ochshorn v. Ithaca City School District, 645 F.3d 533 (2d Cir. 2011), the Second Circuit affirmed the district court's conclusion that a school newspaper was school sponsored. In reaching this decision, the Ochshorn court relied in part on the fact that the school district paid a teacher to act as the newspaper's faculty advisor, and that the newspaper was never published without the advisor's oversight. Id. at 541. See also, e.g., Robertson v. Anderson Mill Elementary Sch., 989 F.3d 282, 289 (4th Cir. 2021) (determining that

8

fourth-grade class's essay booklet was school-sponsored speech in part because teacher "sen[t] copies of that booklet home with the students for their families to read"); Collins, 979 F.3d at 133–34 (relying on "supervision of a college faculty member," among other factors, in concluding that blog post assignment was school-sponsored speech); A.M. ex rel. McKay v. Taconic Hills Cent. Sch. Dist., 510 F. App'x 3, 8 (2d Cir. 2013) (holding that Hazelwood applied to student speech at graduation ceremony because, among other factors, student council's planning of event was subject to faculty oversight, and school district "managed" the ceremony, "review[ed] the speeches before they were delivered," and invited students' parents to the ceremony); Fleming v. Jefferson Cty. Sch. Dist. R-1, 298 F.3d 918, 930 (10th Cir. 2002), as amended on denial of reh'g and reh'g en banc (Aug. 16, 2002) (concluding that art project bore imprimatur of school because school district solicited participation, had faculty members supervise project, and exercised editorial control over submissions to project); Vetrano v. Miller Place Union Free Sch. Dist., 369 F. Supp. 3d 462, 472 (E.D.N.Y. 2019) (holding that student skit in variety show was school-sponsored speech because school "reviewed and approved the [a]cts and [s]kits").[1]

In arguing that Tinker applies, Plaintiff avoids the allegations in her complaint and instead relies on the extrinsic materials submitted with her opposition. (Pl.'s Opp'n at 3–5.) As the Court

---

[1]     Although some courts have drawn a distinction between mandatory, in-classroom activities, on the one hand, and voluntary, extracurricular activities, on the other, see, e.g., Romano v. Harrington, 725 F. Supp. 687 (E.D.N.Y. 1989), Hazelwood itself rejects such a distinction. As the Second Circuit recently explained, "Hazelwood applies to student speech that 'may fairly be characterized as part of the school curriculum, whether or not [it] occur[s] in a traditional classroom setting, so long as [it is] supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences.'" Collins, 979 F.3d at 133 (quoting Peck, 426 F.3d at 628); see also Hosty v. Carter, 412 F.3d 731, 736 (7th Cir. 2005) ("Thus although, as in Hazelwood, being part of the curriculum may be a sufficient condition of a non-public forum, it is not a necessary condition." (emphases in original)); A.M. ex rel. McKay v. Taconic Hills Cent. Sch. Dist., No. 10-CV-20, 2012 WL 177954, at *4 (N.D.N.Y. Jan. 23, 2012) ("[T]he Hazelwood Court explicitly stated its holding was not limited to 'expressive activities [that] . . . occur in a traditional classroom setting.'" (quoting Hazelwood, 484 U.S. at 271)), aff'd, 510 F. App'x 3 (2d Cir. 2013). Accordingly, the Court declines to adopt such a distinction here.

already explained, however, she "may not shore up" the complaint "through extrinsic documents submitted in opposition" to Defendants' motion to dismiss. Madu, 265 F.R.D. at 122–23. Because Plaintiff's allegations establish that The Mast was "'school-sponsored, or at least . . . constituted an expressive activit[y] that students . . . and members of the public might reasonably perceive to bear the imprimatur of the school,'" Collins, 979 F.3d at 134 (quoting Ochshorn, 645 F.3d at 541), Hazelwood—not Tinker—applies here.

Next, "[t]he operative question" under Hazelwood is whether Defendants' refusal to publish R.R.'s poem was "'reasonably related to legitimate pedagogical concerns.'" McKay, 510 F. App'x at 8 (quoting Hazelwood, 484 U.S. at 273). Plaintiff alleges that Defendants refused to publish the poem due to its "allegedly controversial content." (Compl. ¶ 32.) However, the Court agrees with Defendants that their alleged desire to distance the school from "a controversial topic" and "avoid creating an emotional reaction among the student body" constitutes a legitimate pedagogical concern. (Defs.' Mem. at 9.) Plaintiff argues that no such rule can be found in Hazelwood or McKay. (Pl.'s Opp'n at 10.) But, as Hazelwood itself instructs, schools must "retain the authority to refuse to sponsor student speech that might reasonably be perceived . . . to associate the school with any position other than neutrality on matters of political controversy." Hazelwood, 484 U.S. at 272. And other courts have reached the same conclusion. See Fleming, 298 F.3d at 925–26 ("Many cases have applied a Hazelwood analysis to activities outside the traditional classroom where, so long as the imprimatur test is satisfied, the pedagogical test is satisfied simply by the school district's desire to avoid controversy within a school environment." (collecting cases)); see also Planned Parenthood of S. Nevada, Inc. v. Clark Cty. Sch. Dist., 941 F.2d 817, 829 (9th Cir. 1991) ("A school's decision not to promote or sponsor speech that is unsuitable for immature audiences, or which might place it on one side of a controversial issue, is

a judgment call which Hazelwood reposes in the discretion of school officials and which is afforded substantial deference." (citations omitted)); McKay, 2012 WL 177954, at *5 (explaining that school's desire to avoid potential controversy by removing student's religious blessing from graduation ceremony speech constituted legitimate pedagogical concern); Weingarten v. Bd. of Educ. of City Sch. Dist. of City of New York, 680 F. Supp. 2d 595, 601–02 (S.D.N.Y. 2010) (holding that school district's "wish to maintain neutrality on controversial issues" through ban on teachers' political campaign buttons in classroom was "a legitimate pedagogical concern"). Accordingly, Plaintiff has failed to plausibly allege that Defendants' refusal to publish R.R.'s poem was improper under Hazelwood.

The Court's analysis does not end here, however, because Plaintiff also contends that Defendants "blatantly engaged in viewpoint discrimination[.]" (Pl.'s Opp'n at 7.) Viewpoint discrimination "occurs when the government seeks to regulate 'speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction.'" McKay, 510 F. App'x at 8 (quoting Rosenberger v. Rector & Visitors of the Univ. of Va., 515 U.S. 819, 829 (1995)). On the other hand, content discrimination "entails the exclusion of a 'general subject matter' from a forum, rather than a 'prohibited perspective.'" Id. (quoting Bronx Household of Faith v. Bd. of Educ., 650 F.3d 30, 39 (2d Cir. 2011)). This distinction is crucial because "a manifestly viewpoint discriminatory restriction on school-sponsored speech is, prima facie, unconstitutional, even if reasonably related to legitimate pedagogical interests." Peck, 426 F.3d at 633 (emphasis in original); see also Collins, 979 F.3d at 135. By contrast, where the government engages in content-based discrimination in the context of school-sponsored speech, the "Hazelwood standard does not require that the guidelines be the most reasonable or the only reasonable limitations, only that they be reasonable." Peck, 426 F.3d at 630 (citation and quotation

marks omitted, emphases in original).

Plaintiff argues that "Defendants were motivated by a racist reason to suppress the sonnet . . . , a not-unlikely motive in view of the circumstances, including the subject matter of the sonnet and the purported unspecific fears of Defendants as to the reaction of the nearly all white school, faculty and community." (Pl.'s Opp'n at 7.) But Plaintiff's assertion that Defendants were "motivated by a racist reason" is entirely conclusory and therefore the Court need not accept it as true. See Krys v. Pigott, 749 F.3d 117, 128 (2d Cir. 2014) (holding that court is not "required to accept as true allegations that are wholly conclusory"). Moreover, Plaintiff nowhere alleges that Defendants permitted other, contrary viewpoints related to Floyd's murder to be published in The Mast. Instead, Plaintiff simply claims that "other students' poems were published" in The Mast. (Compl. ¶ 57.) This bare allegation offers no support to her claim that R.R. "was discriminated against for a viewpoint expressed in [her poem] rather than for the manner in which [s]he expressed [her]self." Collins, 979 F.3d at 135 (concluding that deletion of student blog post was content-based, rather than viewpoint-based, restriction). As a result, Plaintiff has not plausibly alleged that Defendants engaged in impermissible viewpoint discrimination, rather than permissible content-based discrimination. [2]

---

[2]     Plaintiff's additional argument that The Mast should be considered a public forum or, at the very least, a limited public forum, (Pl.'s Opp'n at 5, 9), does not save her claim. First, she does not allege that Defendants "permitted 'indiscriminate use by the general public,' as is required to create a traditional public forum or designated public forum." Ochshorn, 645 F.3d at 540 (quoting Hazelwood, 484 U.S. at 267). Instead, she alleges that "[a]t all times," Defendants exercised control over The Mast's content. (Compl. ¶ 21.) Second, even if she were correct that The Mast should be considered a "limited public forum," her claim still could not withstand Defendants' motion because, as discussed above, she has not plausibly alleged that Defendants engaged in viewpoint discrimination. See Ochshorn, 645 F.3d at 540 ("In a limited public forum, the government may restrict speech in a way that is viewpoint-neutral and reasonable in light of the forum's established purpose." (citing Peck, 426 F.3d at 626)). Third, and finally, her assertion that "[t]he Hazelwood standard is inapplicable where a school-sponsored publication is a limited public forum," (Pl.'s Opp'n at 9), relies on out-of-Circuit authority and ignores binding Second Circuit caselaw that

For the reasons stated above, the Court concludes that Plaintiff has not plausibly alleged that Defendants violated R.R.'s First Amendment rights by refusing to publish her poem.  This claim is dismissed.[3]

## C.  Fourteenth Amendment Equal Protection Claim

Plaintiff also claims that Defendants racially discriminated against R.R. in violation of the Fourteenth Amendment's Equal Protection Clause.  (Compl. ¶¶ 65–75.)  This claim suffers from numerous flaws that independently require dismissal.

As an initial matter, Defendants contend that Plaintiff's equal protection claim fails because she has not plausibly alleged a First Amendment violation.  (Defs.' Mem. at 11.)  This is because "[w]here . . . an equal protection claim is based on an alleged First Amendment violation, the former 'coalesces with the latter.'"  Odermatt v. Way, 188 F. Supp. 3d 198, 215–16 (E.D.N.Y. 2016) (quoting Tomlins v. Vill. of Wappinger Falls Zoning Bd. of Appeals, 812 F. Supp. 2d 357, 372 (S.D.N.Y. 2011)), aff'd, 694 F. App'x 842 (2d Cir. 2017).  As a result, "'where the First Amendment claim has failed, the equal protection claim fails, too.'"  Id. at 216 (quoting Gentile v. Nulty, 769 F. Supp. 2d 573, 582–83 (S.D.N.Y. 2011)).  Plaintiff offers no substantive response to Defendants' argument.  In fact, she appears to concede the point by asserting that because her

---

squarely forecloses this argument.  See id. at 540–42 (affirming district court finding that school newspaper was limited public forum and applying Hazelwood standard to plaintiffs' claim).

[3]    Plaintiff also asserts a free speech claim under the Fourteenth Amendment.  (Compl. ¶¶ 52–64.) Defendants argue that this claim should be dismissed as duplicative of her First Amendment claim.  (Defs.' Mem. at 8 n.3.)  Plaintiff does not respond to Defendants' argument in her opposition brief, so the Court deems this claim abandoned.  See Jackson v. Fed. Exp., 766 F.3d 189, 198 (2d Cir. 2014) ("[I]n the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned."); see also Rohn Padmore, Inc. v. LC Play Inc., 679 F. Supp. 2d 454, 459 (S.D.N.Y. 2010) ("Where one party fails to respond to an opposing party's argument that its claim must be dismissed, courts may exercise their discretion and deem the claim abandoned." (citation and quotation marks omitted)).  In any event, for the reasons described below, any such claim would "coalesce" with her First Amendment claim—and fall alongside it.

"First Amendment claim remains viable . . . , the equal protection claim remains viable as well." (Pl.'s Opp'n at 11.)

Here, Plaintiff's allegations reveal that her equal protection claim is simply a First Amendment claim in disguise.  In support of this claim, she alleges that Defendants refused to publish R.R.'s poem to prevent R.R. from expressing her viewpoint, i.e., "from advocating for the advancement of African-American citizens of the United States and specifically for George Floyd and those affected by his death," and that as a result, "R.R. was deprived of the equal education afforded to other students because of the intimidation and ostracism she experienced from other students and faculty within the school."  (Compl. ¶¶ 69–70.)  The other allegations that Plaintiff cites in support of this claim, (Pl.'s Opp'n at 11), fare no better.  For example, she alleges that R.R. "identified with and promoted the cause of African American minorities," that "Defendants regarded R.R. as an advocate of African American students and as African-American because R.R. promoted the cause of African American minorities," and that "Defendants prevented and forbade the publication of R.R.'s sonnet in order to suppress R.R.'s freedom of speech . . . especially insofar as R.R. attempted to exercise her freedom of speech . . . on behalf of African American minorities." (Compl. ¶¶ 40, 42, 44.)  Together, these allegations make clear that her "equal protection claim is essentially premised on allegations of viewpoint discrimination."  Odermatt, 188 F. Supp. 3d at 216; see also Afr. Trade & Info. Ctr., Inc. v. Abromaitis, 294 F.3d 355, 363 (2d Cir. 2002) (explaining that plaintiffs' equal protection and First Amendment claims "coalesce[d]" where plaintiffs alleged, among other things, that "[t]he defendant has deprived the plaintiffs of equal protection of the laws to punish them for exercising rights protected by the First Amendment"). Because Plaintiff has failed to plausibly allege a First Amendment violation, her equal protection claim necessarily fails as well.

14

Even if the Court were to set aside this flaw in Plaintiff's equal protection claim, Defendants contend that it still must be dismissed because she has not plausibly alleged that R.R. is a member of a protected class.  (Defs.' Mem. at 11–14; Defs.' Reply at 10–11.)[4]  To state a claim under the Equal Protection Clause, Plaintiff "must demonstrate that [R.R.] was treated differently than others similarly situated as a result of intentional or purposeful discrimination.'" Keles v. Davalos, No. 19-CV-3325, 2022 WL 17495048, at *12 (E.D.N.Y. Nov. 23, 2022) (quoting Phillips v. Girdich, 408 F.3d 124, 129 (2d Cir. 2005)).  In general, this requires a plaintiff to "allege that a government actor intentionally discriminated against them on the basis of" a protected characteristic, such as race.  Hayden v. Cty. of Nassau, 180 F.3d 42, 48 (2d Cir. 1999).

Here, Plaintiff's equal protection claim is premised on her allegation that Defendants refused to publish R.R.'s poem for racially discriminatory reasons.  Plaintiff asserts that she has adequately alleged that R.R. "is a member of a protected class—African-Americans and those who advocate for that class and for those who are regarded by Defendants as African-Americans or advocates of African-Americans."  (Pl.'s Opp'n at 11 (citing Compl. ¶¶ 40–42, 44, 94, 103).) However, Plaintiff's argument fails under closer scrutiny.  Plaintiff nowhere alleges that R.R. is African American.  And her allegation that "Defendants regarded R.R. . . . as African-American," (Compl. ¶ 42), is entirely conclusory and therefore the Court need not accept it as true.[5]

---

[4]    Defendants contend that "[t]here is an insurmountable roadblock to plaintiff's equal protection claims: **R.R. is white**." (Defs.' Mem. at 14 (emphasis in original).)  Plaintiff disputes Defendants' assertion and notes that she "has not asserted in her complaint . . . that [R.R.] is a 'white' person."  (Pl.'s Opp'n at 13.)  Because the complaint does not allege that "R.R. is white," the Court has not considered this argument in resolving Defendants' motion.

[5]    In support of her "regarded as" theory, Plaintiff cites Albunio v. City of New York, 889 N.Y.S.2d 4 (1st Dep't 2009), aff'd, 16 N.Y.3d 472 (2011), which she characterizes as a decision "uph[olding] a jury award in a discrimination case in which [the plaintiff] was discriminated against because [the plaintiff] advocated for a racial minority."  (Pl.'s Opp'n at 12.)  But Albunio is inapposite for several reasons.  Most

Stripped of these allegations, Plaintiff is left with her assertion that she is a member of a protected class of individuals who "advocate[] for African-Americans." (Pl.'s Opp'n at 11.)  For this proposition, she cites Holcomb v. Iona College, 521 F.3d 130 (2d Cir. 2008), and its progeny. (Id.)  Even assuming that these cases apply outside the Title VII employment context, which Defendants dispute, (Defs.' Reply at 11), they do not support Plaintiff's "advocacy" theory of discrimination.  In Holcomb, the Second Circuit recognized the viability of an associational discrimination claim where "[an] employee suffers discrimination because of the employee's own race."  521 F.3d at 139 (emphasis in original); see also Fukelman v. Delta Air Lines, Inc., No. 18-CV-2, 2020 WL 4587496, at *14 (E.D.N.Y. Apr. 13, 2020) ("A plaintiff may plead a claim of discrimination based on association with someone in a protected class, even if the plaintiff is not a member of a protected class, if the discrimination suffered is due to the plaintiff's own race." (emphasis added)), report and recommendation adopted, 2020 WL 2781662 (E.D.N.Y. May 29, 2020).  Here, by contrast, Plaintiff's claim is premised not on R.R.'s own race, but on "the race of the persons on whose behalf the advocacy is occurring."  Frith v. Whole Foods Mkt., Inc., 38 F.4th 263, 272 (1st Cir. 2022) (rejecting "advocacy" theory of discrimination advanced under Title VII).  Plaintiff has provided no persuasive authority for such a sweeping theory, and the Court has found none.[6]

importantly, the Albunio plaintiffs did not assert a "regarded as" theory of discrimination under federal law—they brought associational retaliation claims under the New York City Human Rights Law.

[6]     Plaintiff cites Morales v. NYS Dep't of Lab., 865 F. Supp. 2d 220 (N.D.N.Y. 2012), aff'd on other grounds, 530 F. App'x 13 (2d Cir. 2013), for the proposition that "evidence of [a plaintiff's] advocacy is sufficient to establish her association with a protected race or national origin for purposes of her prima facie case" under Title VII.  865 F. Supp. 2d at 242.  However, the Court respectfully disagrees with the reasoning of Morales, including its reading of Holcomb, and therefore finds it unpersuasive.  In any event, even if the Court were to accept Plaintiff's "advocacy" theory or construe the complaint as raising an associational discrimination claim, it would still fail because, as discussed in greater detail below, Plaintiff has not

Plaintiff's equal protection claim is not yet foreclosed, however, because "[a]lthough the prototypical equal protection claim involves discrimination against people based on their membership in a vulnerable class, . . . the equal protection guarantee also extends to individuals who allege no specific class membership but are nonetheless subjected to invidious discrimination at the hands of government officials." Harlen Assocs. v. Inc. Vill. of Mineola, 273 F.3d 494, 499 (2d Cir. 2001) (citing LeClair v. Saunders, 627 F.2d 606 (2d Cir. 1980) and Village of Willowbrook v. Olech, 528 U.S. 562 (2000) (per curiam)).  Where, as here, a plaintiff does not claim membership in a constitutionally protected class, she may assert an equal protection claim "on both a selective enforcement and a class-of-one theory." Lepper v. Vill. of Babylon, No. 18-CV-7011, 2022 WL 939719, at *18 (E.D.N.Y. Mar. 29, 2022) (citation and quotation marks omitted), aff'd, No. 22-1064, 2023 WL 4004220 (2d Cir. June 15, 2023) (summary order).  These theories "offer distinct pathways for proving a non-class-based Equal Protection violation." Hu v. City of New York, 927 F.3d 81, 93 (2d Cir. 2019).

To state a claim based on selective enforcement, a plaintiff must plausibly allege that "'(1) the person, compared with others similarly situated, was selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person.'" Hu, 927 F.3d at 91 (quoting Zahra v. Town of Southold, 48 F.3d 674, 683 (2d Cir. 1995)).  Thus, "[a]s this test makes clear, . . . [a selective enforcement] 'type of equal protection claim requires proof of disparate treatment and

---

plausibly alleged any facts regarding similarly situated comparators. See Fukelman, 2020 WL 4587496, at *15 (recognizing availability of associational discrimination theory but dismissing plaintiffs' claims because they "d[id] not allege facts regarding any similarly situated comparators who did not associate with Jewish, Israeli and Hebrew-speaking friends or co-workers, and who were punished less severely for the same alleged conduct").

impermissible motivation.'" Id. (quoting Bizzarro v. Miranda, 394 F.3d 82, 87 (2d Cir. 2005)). Based on the "broad definition of 'impermissible considerations,'" selective enforcement claims "protect[] against both discrimination on the basis of a plaintiff's protected status (e.g., race or a constitutionally-protected activity) and discrimination on the basis of a defendant's personal malice or ill will towards a plaintiff." Id. On the other hand, to proceed on a class-of-one theory, a plaintiff must plausibly allege "'[1] that she has been intentionally treated differently from others similarly situated and [2] that there is no rational basis for the difference in treatment.'" Id. (quoting Olech, 528 U.S. at 564). As the Supreme Court explained in Olech, a class-of-one claim finds its basis in the Equal Protection Clause's "purpose . . . to secure every person within the State's jurisdiction against intentional and arbitrary discrimination." 528 U.S. at 564.

It is worth highlighting that "[w]hile both types of Equal Protection claims require a showing that the plaintiff was treated differently from another similarly situated comparator, they differ in at least two key respects." Hu, 927 F.3d at 93. First, a class-of-one claim, unlike a selective enforcement claim, "does not require proof of a defendant's subjective ill will towards a plaintiff[.]" Id. "Instead, a plaintiff can prevail on [a class-of-one] claim on the basis of similarity alone." Id. Second, whereas a class-of-one claim "requires an 'extremely high' degree of similarity between a plaintiff and comparator," a selective enforcement claim "merely requires a 'reasonably close resemblance' between a plaintiff's and comparator's circumstances." Id. A class-of-one plaintiff "must establish that it is 'prima facie identical'" to a comparator by showing that:

> (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake.

18

Lepper, 2023 WL 4004220, at *2 (quoting Hu, 927 F.3d at 92).  With these principles in mind, the Court turns to the parties' arguments.

Defendants argue that Plaintiff has failed to state a selective enforcement claim because the complaint "identifies no comparator, much less a legally proper one."  (Defs.' Mem. at 14.) Plaintiff nowhere responds to this argument in her opposition—she addresses her class-of-one theory only.  (Pl.'s Opp'n at 12.)  Because Plaintiff neither explicitly alleges a selective enforcement claim in the complaint nor responds to Defendants' arguments in favor of dismissal, the Court concludes that Plaintiff has abandoned any selective enforcement claim.  See Jackson, 766 F.3d at 198; see also Rohn Padmore, Inc., 679 F. Supp. 2d at 459.

Nevertheless, Plaintiff contends that her equal protection claim should proceed on a class-of-one theory because she has alleged that R.R. "was adversely treated differently than other student writers for The Mast, for impermissible racial reasons and that Defendants intended to inhibit her free speech for impermissible social reasons."  (Pl.'s Opp'n at 12 (citing Compl. ¶¶ 15, 19, 57, 59).)[7]  But the allegations that she cites in the complaint merely establish that other students submitted materials to The Mast, and that some of those materials, including poems, were ultimately published in The Mast.  These allegations fall far short of plausibly demonstrating that R.R. was "prima facie identical" to a similarly situated comparator, as required to sustain a class-of-one claim.  Lepper, 2023 WL 4004220, at *2 (citation and quotation marks omitted).

For these reasons, Plaintiff's Fourteenth Amendment equal protection claim is dismissed.[8]

---

[7]     The remainder of Plaintiff's argument in support of her class-of-one claim appears to rely on extrinsic materials that the Court has excluded, such as R.R.'s affidavit.  (Pl.'s Opp'n at 12.)  For the avoidance of doubt, the Court notes that it has not considered these materials.

[8]     Because Plaintiff has not plausibly alleged an underlying constitutional violation, any Monell claim against the school district necessarily fails.  See Lepper, 2022 WL 939719, at *30 ("Plaintiffs' Monell claims

D.    **State Law Claims**

Plaintiff also raises the following claims under New York law:  (i) race discrimination in violation of N.Y. Const. art. I, § 11; (ii) violation of R.R.'s right to freedom of speech under N.Y. Const. art. I, § 8; and (iii) violation of the New York State Human Rights Law, N.Y. Exec. Law §§ 291, 296(4).

Federal courts "have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  28 U.S.C. § 1367(a).  However, a court "may decline to exercise supplemental jurisdiction over a claim" if it "has dismissed all claims over which it has original jurisdiction."  Id. § 1367(c)(3).  The Supreme Court has explained that "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims."  Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988).

Here, given that no federal claims remain and diversity jurisdiction does not exist, the interests of judicial economy, convenience, fairness, and comity weigh in favor of not exercising supplemental jurisdiction over Plaintiff's state law claims.  Accordingly, the Court declines to exercise supplemental jurisdiction over these claims and will dismiss them without prejudice.

---

fail because, . . . Plaintiffs have not established any underlying constitutional violations.").  And in the absence of a constitutional violation, the Court need not address Defendants' additional arguments that (i) the complaint fails to plead personal involvement of Haruthunian, Schmettan, and Sefick; (ii) the individual defendants are entitled to qualified immunity; (iii) the official capacity claims are duplicative; and (iv) Plaintiff is not entitled to punitive damages.  (Defs.' Mem. at 21, 24.)  Finally, the Court notes Plaintiff's concession that her fourth cause of action for attorney's fees pursuant to 42 U.S.C. § 1988, (Compl. ¶¶ 76–78), is "no[t] [a] separate cause of action," (Pl.'s Opp'n at 22), and therefore it is dismissed.

### III.    MOTION FOR SUMMARY JUDGMENT

Because Defendants' motion to dismiss is granted, Plaintiff's motion for partial summary judgment on her federal law claims is denied as moot.  Additionally, even if the motion were not moot, it would be denied on procedural grounds.

Local Civil Rule 56.1 "sets forth specific requirements about how the facts relied upon by the moving party and disputed by the opposing party are to be presented."  Anora v. Oasis Pro. Mgmt. Grp., Ltd., No. 19-CV-11732, 2023 WL 2307180, at *2 (S.D.N.Y. Mar. 1, 2023).  Rule 56.1 requires that a party moving for summary judgment "annex[] to the notice of motion a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried."  Loc. Civ. R. 56.1(a).  A movant who fails to submit a Rule 56.1 statement proceeds at her own peril, as "[f]ailure to submit such a statement may constitute grounds for denial of the motion."  Id.; see also T.Y. v. New York City Dep't of Educ., 584 F.3d 412, 417 (2d Cir. 2009) ("The requirement is strict; failure to submit a Rule 56.1 statement with a motion for summary judgment may result in the motion's denial.").

Here, Plaintiff inexplicably failed to submit a Rule 56.1 statement along with her motion for summary judgment.  Only after Defendants highlighted Plaintiff's omission, (see Defs.' Opp'n at 13–14, ECF No. 33), did Plaintiff file her Rule 56.1 statement—more than two months after she served her opening brief.  Plaintiff offers no explanation for her failure to comply with the Court's basic procedural rules.  Instead, she merely urges the Court to exercise its discretion to overlook her untimely filing.  (Pl.'s Reply at 6, ECF No. 36.)  The Court will not do so here, especially given that she has not even attempted to establish excusable neglect for her late filing.  See also Fed. R. Civ. P. 6(b)(1)(B) ("[T]he court may, for good cause, extend the time . . . on motion made after the time has expired if the party failed to act because of excusable neglect.").  Accordingly,

21

even if the motion were not moot, it would be denied for failure to timely file a Rule 56.1 statement.

See Anora, 2023 WL 2307180, at *3 (denying motion for summary judgment based on movant's failure to timely submit Rule 56.1 statement).

## IV. CONCLUSION

For the reasons stated above, Defendants' motion to dismiss pursuant to Rule 12(b)(6) is GRANTED and the complaint is DISMISSED. Plaintiff's federal claims (Counts 1–4) are dismissed with prejudice. The Court declines to exercise supplemental jurisdiction over her state law claims (Counts 5–8) and dismisses them without prejudice.

Plaintiff's motion for partial summary judgment under Rule 56(a) is DENIED as moot.

The Clerk of Court is respectfully directed to enter judgment accordingly and close this case.

**SO ORDERED.**

Dated:  September 18, 2023
         Central Islip, New York

                                          /s/ JMA
                                 JOAN M. AZRACK
                                 UNITED STATES DISTRICT JUDGE